**MID VALLEY BANK, a California corporation, Plaintiff,**

**v.**

**NORTH VALLEY BANK, etc., et al., Defendants.**

**And Related Third–Party Action.**

**No. Civ. S–88–1691 LKK.**

United States District Court, E.D. California.

May 21, 1991.

---

William Hvidsten, Downey, Brand, Seymour & Rohwer, Sacramento, Cal., for plaintiff Mid Valley Bank.

Dale C. Campbell, Weintraub, Genshlea & Sproul, Sacramento, Cal., for North Valley Bank.

Lisa A. Wible Wright, Todd A. Murray, Hefner, Stark & Marois, Sacramento, Cal., for Della Mae Montgomery.

David Larson, Kathleen Clark, Larson & Burnham, Oakland, Cal., for Shell Oil Co.

## ORDER

KARLTON, Chief Judge Emeritus.

This matter is before the court on various motions. For the reasons I explain below, (1) all motions for summary judgment are denied;[1] (2) defendant North Valley Bank's ("NVB") motion to strike plaintiff's jury demand is granted; (3) plaintiff's motion to withdraw admissions is granted and sanctions are imposed; (4) defendant NVB's motion for sanctions is denied, and defendants Shell Oil Company's ("Shell") and Della Mae Montgomery's ("Montgomery") motions for sanctions are granted.

# I

## SUMMARY JUDGMENT STANDARDS UNDER FED.R.CIV.P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

---

1. Given the court's disposition of the motions for summary judgment, the motions of the parties raising various objections to evidentiary matters before the court, including plaintiff's evidentiary objections to the declarations of David A. Lawrence and Thomas E. Bailey and its request to strike portions of those declarations, as well as various motions to take judicial notice of certain documents, are rendered moot.

*Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita*, 475 U.S. at 586 n. 11; *First Nat'l Bank*, 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. at 1592; *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. at 488; *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

## II

### CERCLA CLAIMS

Plaintiff brought suit pursuant to the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERC-LA"), 42 U.S.C. § 9601 et seq. and various state claims. It alleges that defendants, as prior owners or operators of certain real property, are liable under CERCLA for funds plaintiff expended cleaning up hazardous substances found in the soil on the real property. Plaintiff seeks both damages pursuant 42 U.S.C. § 9607(a)(2)(B) and declaratory relief relative to future costs pursuant to 42 U.S.C. § 9613(g)(2).

In CERCLA Congress created a private cause of action against various classes of persons for recovery of certain "response costs" occasioned by the "release" of hazardous waste at a site. 42 U.S.C. § 9607; *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–1153 (9th Cir.1989); *see also Wickland Oil Terminals v. AS-ARCO, Inc.,* 792 F.2d 887, 890 (9th Cir. 1986). The suit lies "notwithstanding any other provision or rule of law, and [is] subject only to [specified statutory] defenses." *Id.* The suit may seek recovery of costs of response incurred consistent with the national contingency plan. 42 U.S.C. § 9607. The statute creates an additional private right of action for declaratory relief, premised on the party's ability to state a claim for damages. 42 U.S.C. § 9613(g)(2).

There are multiple elements to a cause of action under § 9607. Plaintiff must allege that the site is a "facility" within the meaning of 42 U.S.C. § 9601(9) and that there has been a "release" or that there is a "threatened release" of a "hazardous substance," *id.* at § 9607(a)(4). As I explain *infra, see* § IIE, relative to at least certain claims it appears that plaintiff must also allege a causal element. Finally, plaintiff must allege that the incurred response costs are "consistent with the national contingency plan." *Id.* at §§ 9607(a)(4) & (a)(4)(B).

Defendants seek summary judgment on the CERCLA causes of action. They con-tend that because of the so-called petroleum exclusion, and as a matter of fact, plaintiff cannot establish that a release of a hazardous substance occurred. They also contend that plaintiff cannot demonstrate that the cleanup actions were consistent with the national contingency plan ("NCP").

Below I determine that as a matter of statutory interpretation the exclusion does not apply to adulterated waste oil. I then turn to an examination of the various substances allegedly found on the property in order to determine whether claims premised upon the presence of such substances tender viable CERCLA causes of action. Thereafter, I examine the causation element of a CERCLA cause of action, and finally examine the requirement that the cleanup costs be consistent with the National Contingency Plan. I conclude that the existence of material issues of fact precludes the granting of summary judgment for either plaintiff or defendants on the issues tendered relative to the CERCLA claims.

## A. *The Petroleum Exclusion*

It appears to be uncontested that if there is any contamination it was the result of the corrosion or leaking of certain underground tanks discovered at the facility which were used to store gasoline, diesel and waste oil. There is evidence that lead, zinc and thallium were among the substances released. Declaration of Jill P. Slater at p. 3 and Exhibit 2. Defendants, relying on the so-called "petroleum exclusion," contend that there was no release of a "hazardous substance" within the meaning of the Act at the site. Accordingly, defendants argue they have no CERCLA liability for the costs of the cleanup.

CERCLA defines "hazardous substance" by reference to substances listed under various other federal statutes.[2] Under the

---

**2.** A "hazardous substance" means in part: "(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics iden-tified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollu-

statute, however, "petroleum, including crude oil or any fraction thereof" is not a "hazardous substance." 42 U.S.C. § 9601(14) [3]. Plaintiff contends that because the wastes consisted of adulterated petroleum, the exclusion does not apply. The initial question tendered is whether adulterated petroleum and diesel oil fall within the petroleum exclusion. The issue raises a question of statutory interpretation.

As with any matter of statutory interpretation, "the first step a district court must take ... is to determine if there is binding authority construing the statute," *Cervantez v. Sullivan*, 719 F.Supp. 899, 909 (E.D. Cal.1989). In the matter at bar, no such authority exists. The Supreme Court has not had occasion to address the scope of the petroleum exclusion, and although the Ninth Circuit has examined the relevant statute, it has not resolved the issue. The Circuit has held that the petroleum exclusion extends to contamination resulting from an underground storage tank leak of unadulterated refined and unrefined gasoline and its constituents, benzene, toluene, ethyl-benzene, xylene and lead. *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 805 (9th Cir.1989). The court, however, expressly declined to decide whether the petroleum exclusion covers not only "unadulterated petroleum fractions but also those which have been contaminated during use." *Wilshire Westwood Associates*, 881 F.2d at 805 n. 5.

In the absence of a definitive construction, I next turn to the plain words of the statute. *Cervantez*, 719 F.Supp. at 910. CERCLA does not define the term "petroleum." By virtue of that silence, the exclusion is as susceptible to a reading including as excluding adulterated petroleum products.

Given the absence of binding authority and plain meaning, I turn to "the traditional signposts of statutory construction," *Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1353 (9th Cir.1985), beginning with an examination of the pertinent legislative history, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987), and the interpretation of the statute by the relevant administrative agency. *Brock*, 762 F.2d at 1353.

A central document in examining both the legislative history and the contemporaneous administrative construction is a Memorandum from the EPA General Counsel to the EPA Assistant Administrator for Solid Waste and Emergency Response, dated July 31, 1987 (the "EPA Memo"). Under the EPA Memo, a release of substances found in used oil which are not found in crude oil or refined petroleum fractions may trigger CERCLA response actions, not to the release of used oil, but to the contaminants present in the oil. EPA Memo at pp. 1–2. The EPA Memo's conclusion is supported by citations to the congressional debates on the final compromise Superfund legislation. The citations addressed both what the petroleum provision deleted from the bill and what it did not.[4] The EPA

---

tant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15." 42 U.S.C. § 9601(14).

3. The statute provides that the term hazardous substances

 [D]oes not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14).

4. The EPA Memo cites a variety of statements concerning mixtures of oil and other hazardous substances, including those found at 126 Cong. Rec. H11798 (Rep. Edgar) (oil slicks and industrial oil waste); 126 Cong.Rec. S14963 (daily ed. November 24, 1980) (Sen. Randolph) (contaminated oil slick), and other petroleum products containing hazardous substance additives intended to be addressed by the legislation including PCB's in transformer fluid, *id.* at S14963 (Sen. Randolph) and S14967 (Sen. Stafford); dioxin in motor fuel used as a dust suppressant, *id.* at S14974 (Sen. Mitchell); PCB's in waste oil, *id.* (Sen. Mitchell) [FN6]; and contaminated waste oil, *id.* at S14980 (Sen. Cohen).

determined that the purpose of the petroleum exclusion was "to remove from CERCLA jurisdiction spills only of oil, not releases of hazardous substances mixed with oil." EPA Memo at 5–6. As the EPA explained in its final rule published April 4, 1985:

Final Rule (adjusting reportable quantities under Section 102 of CERCLA)

EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products. However, *EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.*

50 Fed.Reg. 13,460 (April 4, 1985) (emphasis added).

While neither the legislative history nor the administrative determination are dispositive, they are persuasive. Moreover, I note that the EPA's distinction between adulterated and unadulterated petroleum products for liability purposes is not unique. Thus service station dealers are not liable under §§ 9606 and 9607 if a release or threatened release is due to recycled oil if "not mixed with any other hazardous substances." 42 U.S.C. § 9614(c)(1)(A).[5]

Some additional support for an interpretation of the petroleum exclusion which does not include waste oil may be found in a variety of cases which have addressed CERCLA in various contexts. Indeed, a number of CERCLA cases have assumed, in the course of deciding other issues, that

the petroleum exclusion does not apply to waste oil or petroleum products contaminated with hazardous substances. *See, e.g., United States v. Mexico Feed and Seed Co., Inc.,* 729 F.Supp. 1250 (E.D.Mo. 1990) (liability with respect to when tanks containing waste oil contaminated with PCB's were placed on the property); *see also U.S. v. Bliss,* 667 F.Supp. 1298 (E.D. Mo.1987); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149 (9th Cir.1989) (facility used as an active disposal site for waste from both industrial sources and oil field operations). Moreover, at least one case has held that contaminants in excess of the amounts that would have occurred in petroleum during the oil refining process and substances that "would not have occurred due to the refining process" do not fall under the petroleum exclusion. *State of Washington v. Time Oil Co.,* 687 F.Supp. 529, 532 (W.D.Wash.1988).[6]

In light of all the above, I conclude that waste oil containing CERCLA hazardous substances does not fall under the CERCLA petroleum exclusion. Having so concluded, I now turn to a substance by substance examination of defendants' contention that the CERLA claims cannot prevail because they fall within the petroleum exclusion. At the same time, I examine plaintiff's claim that it is entitled to partial summary judgment relative to the defense.

### B. *Particular Substances*

■ There is evidence that the soil samples taken at the property contained elevated levels of zinc, lead and thallium.[7] Each of those substances are properly designated as a hazardous substance within the

---

5. Specifically, CERCLA provides that "[n]o person ... may recover, under subsection (a)(3) or (a)(4) of section 9607 of this title, from a service station dealer for any response costs or damages resulting from a release or threatened release of recycled oil, or use the authority of section 9606 of this title against a service station dealer ... if such recycled oil (A) is not mixed with any other hazardous substances...." 42 U.S.C. § 9614(c).

6. State of Washington's holding is undermined by its complete lack of analysis or explanation.

7. Various other hazardous substances were found in the soil samples (arsenic, barium, beryllium, cobalt, chromium, copper, mercury, molybdenum, nickel, lead, selenium, thallium, vanadium, zinc, benzene, ethyl benzene, toluene and xylene). Plaintiff only contends that lead, zinc and thallium were elevated above background levels. Since plaintiff did not sample the waste oil tank contents, plaintiff cannot prove a hazardous substance was released as to those substances which do not have elevated levels.

meaning of CERCLA.[8]

The parties disagree as to whether the number of soil samples taken is sufficient to statistically prove the presence of elevated levels of these substances at the facility. Because there is evidence to support each side's position, partial summary judgment must be denied.

The parties also disagree as to the source of the various hazardous substances. Relative to zinc and thallium, it may be said that whatever the source, the record does not indicate that these substances are typical additives found in gasoline, diesel fuel or petroleum. Thus, to the extent the summary judgment motion relative to zinc and thallium is premised on the petroleum exclusion, it must be denied.

The source of the lead in the soil samples also appears to be a disputed issue of fact. If the lead results from its use as an additive to petroleum products, and was found at the level expected of purely petroleum additives, it would fall under the petroleum exclusion and would not be a "hazardous substance" for the purpose of CERCLA liability. *State of Wash. v. Time Oil Co.,* 687 F.Supp. at 536. If, on the other hand, the level exceeded the amount that would have occurred in petroleum during the refining process, then the petroleum exclusion would not apply. *Id.* at 537; *see also* EPA Memo at p. 3. Defendants maintain that the lead derives either from refined petroleum products or natural sources. In contrast, plaintiff contends, based on the sample results and declarations from past operators, that the lead found in the soil samples may be the result of waste oil. Because there is evidence to support both

parties' contentions, summary judgment must be denied.

Whether the soil samples contained elevated levels of lead or levels within background is also a disputed issue of fact in this case. The parties also disagree as to whether the number of soil samples analyzed for lead is sufficient to prove a statistically elevated level of lead at the site, as well as its source. Since there is evidence to support the contentions of both sides, there remain factual disputes over the presence of lead and its source. Thus whether the lead triggers CERCLA liability in this case is in factual contention.

For the reasons explained above, all motions for summary judgment premised upon the petroleum exclusion are denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir. 1987).

## C. *Naturally Occurring Substances Under CERCLA*

■ Defendants contend that the metals at the site are found at concentrations within background levels, Declaration of Thomas E. Bailey at 3:26–4:2, and thus are naturally occurring. They then argue that there is no CERCLA liability for the cleanup of naturally occurring hazardous substances.

Assuming that no CERCLA claim lies for the cleanup of naturally occurring substances at naturally occurring levels,[9] summary judgment may not be granted on that

---

**8.** Zinc is designated a "toxic pollutant" pursuant to § 307(a)(1) of the Clean Water Act (40 C.F.R. § 401.15; 33 U.S.C. § 1317(a)), and is, therefore, designated a CERCLA "hazardous substance" under 42 U.S.C. § 9601(14). Lead is also designated a "toxic pollutant" pursuant to § 307(a)(1) of the Clean Water Act (40 C.F.R. § 401.15; 33 U.S.C. § 1317(a)), and is, therefore, designated a CERCLA "hazardous substance" under 42 U.S.C. § 9601(14). Finally, thallium is designated a "toxic pollutant" pursuant to § 307(a)(1) of the Clean Water Act (40 C.F.R. § 401.15; 33 U.S.C. § 1317(a)), and is, therefore, designated a CERCLA "hazardous substance" under 42 U.S.C. § 9601(14).

**9.** CERCLA authorizes EPA to respond to situations where there is a release or threat of release of a hazardous substance, 42 U.S.C. § 9604(a)(1). The statute, however, limits EPA's authority to respond to naturally occurring substances. *See* 42 U.S.C. § 9604(a)(3). It may be argued by analogy to the legislative limitation on EPA's authority that a private party may not recover for funds expended on the cleanup of naturally occurring substances. Alternatively, it may be said that where only naturally occurring hazardous materials are present, there has been no release within the meaning of the statute. *See* footnote 6.

basis in this case. Relative to lead, zinc and thallium, there continue to be disputed issues of fact as to whether the levels found are elevated.

Concerning thallium, defendants' consultants testified that the levels found in the soil samples were not elevated above background levels; plaintiff's consultant, on the other hand, testified that the level of thallium statistically exceeded background levels. Accordingly, there remains a genuine issue of material fact as to whether a hazardous substance which triggers CERCLA liability was released at the facility.

Similarly, whether the lead and zinc found in the soils are from naturally occurring deposits or from contamination are contested issues of fact. The plaintiff's and defendants' consultants appear to disagree on the statistical meaning of the sample results and thus, there remain factual disputes over the sources of the lead and zinc.

Since there is disputed evidence and a reasonable jury could find for plaintiff on the issue of the sources of various metals found in the soil samples, summary judgment must be denied.

**D. State Standards and Metal Concentrations**

Both banks seek summary judgment relying on standards promulgated by the state of California. Thus defendants contend that the levels of metals in the soil samples are well below the state's relevant action levels and therefore, no response under CERCLA was required. Plaintiff, on the other hand, maintains that used oil is hazardous according to the California DHS, and that underground storage tanks must be disposed of as hazardous substances under California law, thus triggering CERCLA liability. As I now explain, since I do not agree with the parties' premise, I cannot support their conclusions.

CERCLA provides that "nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614. The term "hazardous substance," however, is defined by federal standards, not state standards. 42 U.S.C. § 9601(14)(A).

Given the statute, it seems clear that the defendants' argument that the state standards relieve them of obligations they otherwise would have under CERCLA must be rejected. On the contrary, once the elements of CERCLA liability have been established, a defendant may not escape liability for its proportionate cost of cleanup because of the limited character of its contribution to the release of a hazardous substance.

Under CERCLA, liability is imposed regardless of the concentration of the hazardous substances present in a defendant's waste, so long as the contaminants are listed "hazardous substances" pursuant to 40 C.F.R. § 302.4(a). *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 735 F.Supp. 358, 361 (W.D.Wa.1990), *aff'd* 909 F.2d 1260 (9th Cir.1990). Put another way, CERCLA does not impose a quantitative element relative to finding a "hazardous substance." *Id.* at 361 (quoting *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989)). *See also United States v. Wade*, 577 F.Supp. 1326, 1340 (E.D.Pa. 1983) (mixture of wastes containing any quantity or concentration of a "hazardous substance," is itself a hazardous substance); *United States v. Carolawn Co.*, 21 Env't Rep.Cas. 2124, 2126–27 (D.S.C. June 15, 1984) (same); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 176 (W.D.Mo.1985) (same). Since CERCLA imposes no quantitative requirement on the term "release," if any release of a CERCLA hazardous substance has occurred, the second element of CERCLA liability is found regardless of the amount of the release. *Pacific Corp.*, 735 F.Supp. at 361.

At first blush, this mode of analysis may be thought implausible since it appears to suggest the imposition of massive cleanup costs despite slight contributions to the release; however, such is not the result. Rather, it has been held that where wastes

are commingled and the harm is indivisible, contribution of a small amount to a potentially large indivisible harm does not affect the defendant's liability, but is taken into consideration in apportioning damages during the contribution phase. *U.S. v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D.Cal. 1987). The rule has been explained as necessary to avoid the "absurd result that each defendant in a multi-defendant case ... can avoid liability by relying on the low concentrations of hazardous substances in its waste, while the plaintiff is left with the substantial cleanup costs associated with the defendants' accumulated wastes." *City of New York v. Exxon Corporation,* 744 F.Supp. 474, 484 (S.D.N.Y.1990).

In sum, CERCLA liability is triggered regardless of the extent of a defendant's contribution of contamination to the site. In the instant matter, there is evidence to support the presence of allegedly elevated levels of hazardous substances in the soil samples, thus satisfying the second element of CERCLA liability, a "release of a hazardous substance." Defendants' reliance on standards set by the state must be rejected.

 Plaintiff's argument concerning used oil and underground storage tanks fairs no better than defendants'. As noted above, CERCLA does not preempt the state's power to impose additional liability or requirements with respect to the release of hazardous substances, and it may well be that the state has done so relative to waste oil and used tanks. Such heightened requirements, however, do not bear upon the defendants' CERCLA liability, but rather bear upon the state causes of action the plaintiff has pled. Summary judgment relative to plaintiff's CERCLA claims must also be denied on this issue.

### E. *Causation*

In what may only be described as a convoluted briefing posture,[10] the parties engage in a particularly unenlightening debate about causation. Defendants contend that any release of hazardous substances at the site did not "cause" plaintiff to incur response costs.

Like so much else relating to this extraordinarily poorly drafted statute, identifying the requisites of the causation element of liability, if any, is a chancy business. There are multiple possible readings in which, for instance, as to all classes of potential defendants except those otherwise described in 42 U.S.C. § 9607(a)(4) no causation requirement exists at all, or alternatively in which there is a requirement that the defendant cause the incurring of response costs where the claim is predicated on a threatened release as opposed to an actual release, or finally causing response costs is required where the claim is predicated on either an actual or threatened release.[11]

Although the statute is sufficiently ambiguous so that an argument can reasonably be made that the words "from which there is a release or a threatened release" modifies only the class of defendants otherwise described in subsection (4), I am satisfied that such a reading is inappropriate. As Judge Oakes explained on behalf of the Second Circuit, the strange paragraphing of the statute giving rise to such a potential reading appears to be a printer's error. *See State of New York v. Shore Realty*

**10.** Despite NVB's assertion to the contrary, as best the court can determine, this issue was raised by it for the first time in its closing brief in support of its motion for summary judgment. As the Ninth Circuit has explained, "[n]ew material does not belong in a reply brief.... Certainly the use of new material in a reply brief transgresses against the canons of fair forensics." *Von Brimer v. Whirlpool Corp.* 536 F.2d 838, 846 (9th Cir.1976). Nonetheless, Shell has raised the issue in its opposition to plaintiff's motion for summary judgment and plaintiff has responded in its closing brief. Under these circumstances, the issue appears to be properly before the court, at least in connection with Shell's opposition to plaintiff's motion.

**11.** The statute reads in the portion relevant to the instant claims, "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance were disposed of ..., (4) any person who accepts ... for transport ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance shall be liable." 42 U.S.C. § 9607(a).

*Corp.*, 759 F.2d 1032, 1043 n. 16 (2nd Cir. 1985). Accordingly, two potential readings of the causation requirement are left, one attaching to any claim of liability, the other only where there has been a threatened release.

In dicta, the Ninth Circuit has articulated the third element of a prima facie case under CERCLA to be that the " 'release' or 'threatened release' [must have] caused the plaintiff to incur response costs that are 'consistent with the national contingency plan.' " *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d at 1152. Nonetheless, differentiated analyses, depending on whether liability is predicated on responses to actual releases or threatened releases, may apply. The statute is structured so that the term "release" is contained in a clause independent of the clause containing the language "causes the incurrence of response costs." The causation language thus appears to modify only the term "threatened release." 42 U.S.C. § 9607(a)(4). Given the tortured history of § 9607 noted in *Shore Realty*, it may be that a reading of the statute based on its grammar is inappropriate. Nonetheless the court in *Ascon* did not address this grammatical difficulty, and since a determination of the scope of a causation element was not necessary to the resolution of the decision in *Ascon*, the court's articulation of the third element of a prima facie case is *dicta*. Moreover, the *Ascon* court's reliance on *Shore Realty* undermines the dicta since the latter court noted the ambiguity inherent in the statute. *See Shore Realty*, 759 F.2d at 1044 n. 18.

This court's independent research has revealed no Ninth Circuit case definitively addressing construction of the causation element in a CERCLA case. It therefore appears to remain an open question in the Ninth Circuit whether a causal connection between an actual release and the response costs is a necessary predicate to liability. If the causal connection between a release and the incurring of response costs is not an element of a cause of action under CERCLA, then liability for an actual release would attach so long as the response costs incurred by plaintiff were consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(A). Put another way, it may be that strict liability attaches when an actual release of a CERCLA hazardous substance has occurred.

 Assuming, without deciding, that causation is a necessary element of a claim predicated on an actual release, defendants' reliance on *Amoco Oil* appears to the court to be quite puzzling. It is true that the case notes that the issue of causation to be resolved in a CERCLA case is not whether defendants caused a release of hazardous substances, but whether they caused the incurring of response costs. *Amoco Oil*, 889 F.2d at 670. It is also true that the court held "a plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that any release violates, or *any* threatened release is likely to violate *any* applicable state or federal standard." *Id.* at 671 (emphasis in the original). Defendants' argument that in the absence of such a demonstration a plaintiff cannot prevail, however, seems plainly in error. Under *Amoco*, demonstrating a violation of state or federal standards is "not the exclusive means of justifying response costs." *Id.* Rather, the court explained, the causation question is essentially a fact based "inquiry into the circumstances ... [which] should focus on whether the particular hazard justified any response actions." *Id.* at 670.

 NVB seems to suggest that because plaintiff did not know until after the filing of this lawsuit about the quantity of lead, zinc and thallium, their presence in elevated quantities could not have caused plaintiff's incurring of response costs within the meaning of the statute. The argument has a common sense appeal, nonetheless it cannot prevail.

The statute is silent as to whether a plaintiff must have actual knowledge of the presence of particular hazardous substances as a prerequisite to a finding that a defendant caused the response cost by having contributed to the release of the substance at the facility. Certainly the use of

causation language can suggest a knowledge component. Nonetheless, such a reading is not inevitable. As noted above, the *Amoco* court's reading of the causation language, rather than focusing on the plaintiff's state of mind, focuses on whether as a matter of fact the release was of sufficient character as to justify any response. Given the statute's purpose which was "to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created," *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1455 (9th Cir.1986), I cannot find fault with the *Amoco* court's reading that the causation element should "rest upon a factual inquiry into the circumstances of a case and should focus on whether the particular hazard justified any response actions." *Amoco Oil*, 889 F.2d at 670. Given a construction of the causation element which examines the extent of the release as a matter of fact, in the matter at bar the issue of causation is one for the jury. The factual dispute concerning whether a sufficient threat to public health was presented so as to justify responsive actions precludes summary judgment.

 Plaintiff, relying at least in part on state standards relating to water quality and the removal of underground tanks, contends that under the *Amoco* court's holding, liability is established as a matter of law because it has demonstrated a violation of an applicable state standard. In holding that a plaintiff meets the liability requirement as a matter of law if it is shown that a release violates any applicable state standard, the *Amoco* court was attempting to set the outer boundaries of liability. What the parties in the instant action appear to misapprehend, however, is

that the standards discussed by the *Amoco* court are those addressed in 42 U.S.C. § 9621. That section, entitled "cleanup standards," focuses in subsection (d) on the extent of a cleanup. In relevant part, the statute provides that with respect to a hazardous substance, the degree of cleanup can be controlled by state standards that are more stringent than federal standards. The requirement that the substance which is being remediated be hazardous, however, is not modified by the imposition of more stringent state cleanup standards. As noted above, the definition of "hazardous" under CERCLA is a matter of federal designation. 42 U.S.C. § 9601(14). A finding that the substance in question meets the federal definition of hazardous remains as a predicate to liability. To the extent that the Fifth Circuit may have held otherwise, I decline to follow its reasoning.

**F. The Requirement that Cleanup Actions Be Consistent With the NCP**

 NVB contends that summary judgment should be granted on the ground that plaintiff's actions were not consistent with the NCP, and thus plaintiff cannot prove an essential element of a CERCLA cause of action.

CERCLA does not explicitly define the consequences to a private party for its failure to comply with the NCP when not under an EPA order.[12] In this circuit, however, it has been specifically held that a failure to comply with the NCP is not a defense to liability, but goes only to the issue of damages. *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir.1988). *See also U.S. v. Stringfellow*, 661 F.Supp. at 1062 ("failure to comply with the national contingency plan ... [is] not [a] defense[]

12. For actions taken by the government, CERCLA specifies the consequences of noncompliance with the NCP. 42 U.S.C. § 9613(j) provides:
 "(3) Remedy: If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such

other relief as is consistent with the national contingency plan.
 "(4) Procedural errors: In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made."

to liability, although [it] may be [a] relevant factor[ ] to consider with respect to damages"). In the instant case, plaintiff maintains it will prove that its response actions were both necessary and consistent with the criteria set forth in the NCP during the damages portion of its CERCLA case. Plaintiff's opposition at 10:14–17. Since under *Cadillac Fairview,* consistency with the NCP is not an element of liability, inconsistency is not a basis for granting summary judgment on the liability question. Summary judgment is DENIED on the issue of compliance with the NCP.

### III

### DEFENDANT NVB'S MOTION TO STRIKE PLAINTIFF'S JURY DEMAND FOR THE CERCLA CAUSES OF ACTION

North Valley Bank has moved to strike plaintiff's jury demand relative to the first and second causes of action which are based on its CERCLA claims.

#### A. *Law and Equity*

■■■ Federal Rule of Civil Procedure 38(a) provides that "[t]he right to a trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved." By its terms, the Seventh Amendment applies only to "[s]uits at common law, where the value in controversy shall exceed twenty dollars." Since the Amendment deals only with suits at common law, it has no application to suits in equity. *United States v. State of Louisiana,* 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950). The question becomes whether a CERCLA private cause of action for reimbursement of response costs is legal or equitable in nature.

The Supreme Court has explained that where a private cause of action seeks reimbursement, the suit is in restitution which is an equitable remedy. *Porter v. Warner Holding Co.,* 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332 (1946). In light of this holding, the courts have repeatedly held that a CERCLA suit seeking reimbursement for response costs lies in equity and thus the parties are not entitled to a jury trial under the Seventh Amendment. *U.S. v. Northernaire Plating Co.,* 685 F.Supp. 1410, 1413 (W.D.Mich.1988), *aff'd,* 889 F.2d 1497 (6th Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *Wehner v. Syntex Corp.,* 682 F.Supp. 39 (N.D.Cal.1987); *U.S. v. Mottolo,* 605 F.Supp. 898 (D.N.H.1985) (collecting cases).

Defendant's motion to strike plaintiff's jury demand on the CERCLA causes of action is GRANTED.

#### B. *Order of Trial Of Equitable and Legal Issues*

Plaintiff contends that its equitable and legal causes of action have common issues of fact. Plaintiff maintains that it is entitled to a jury trial on its eight legal causes of action before the equitable CERCLA issues are addressed to preserve its right to a jury trial. Plaintiff has not formally moved for such an order and the issue is deferred for determination at the pretrial conference.[13]

### IV

### PLAINTIFF'S MOTION TO WITHDRAW ADMISSIONS

■■■ Plaintiff has moved to withdraw various admissions. Plaintiff responded to the defendants' request for admissions on an untimely basis, *see* Declaration of Michael Vergara in Opposition to Plaintiff's Motion to Withdraw Admissions, and thus, the requests are deemed admitted pursuant to Rule 36(a). For the rea-

---

**13.** Although the issue is deferred, the parties' attention is directed to *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 509, 79 S.Ct. 948, 955, 3 L.Ed.2d 988 (1959); *Parklane Hosiery Co, Inc. v. Shore,* 439 U.S. 322, 353–55, 99 S.Ct. 645, 662–64, 58 L.Ed.2d 552 (1979); and *GTE Sylvania, Inc. v. Continental T.V., Inc.,* 537 F.2d 980, 986

n. 7 (9th Cir.1976), *aff'd,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). At pretrial, the parties should be prepared to discuss whether in light of those cases it would be appropriate to try all the causes of action simultaneously, utilizing the jury for advisory purposes relative to the CERCLA causes of action.

sons I now explain, the motion is granted although substantial sanctions shall be awarded defendant North Valley Bank.

Federal Rule of Civil Procedure 36(a) bluntly provides that when a request for admissions has been properly made "[t]he matter is admitted unless, within 30 days after service or within such ... longer period as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection." The rule could not be plainer. Plaintiff's counsel seeks relief from the strictures of the rule premised upon a preposterous assertion of good faith misunderstanding of its responsibilities unworthy of extended discussion.

The rule also provides, however, that "the court may permit withdrawal ... when the presentation of the merits will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal ... will prejudice that party in maintaining the action or defense on the merits." Fed.R.Civ.P. 36(b). Accordingly, although the motion is, as the parties acknowledge, directed to the sound discretion of the court, *see 999 v. C.I.T. Corp.*, 776 F.2d 866, 869 (9th Cir.1985), the discretion should not be exercised in terms of the defaulting party's excuses, but in terms of the effect upon the litigation and prejudice to the resisting party. In this regard, it seems clear to me that the admissions, when compared to the response actually filed, significantly impair plaintiff's ability to present the merits of its case. Moreover, given that the court has vacated all dates, any prejudice suffered by NVB can easily be cured in the course of setting new dates.

Nonetheless, plaintiff's disobedience to the Federal Rules and its imposition upon NVB cannot go unnoticed. The court orders counsel for NVB to file an affidavit setting forth its charges to its client in preparation of its opposition to the motion to withdraw admissions. If it is unable to separately segregate its charges relative to that opposition, it may file an affidavit setting forth its good faith estimate. Within ten (10) days of the filing of that document, plaintiff shall pay to defendant NVB the amount set forth or shall file a request that the court review the reasonableness thereof. Such review will be conducted by the court in chambers and without argument. Plaintiff's counsel shall, in addition, pay to defendant's counsel as a further sanction the sum of Two Hundred Fifty Dollars ($250). Finally, plaintiff's counsel shall pay to the Clerk of the Court, for deposit in the General Treasury of the United States,[14] the sum of Two Hundred Fifty Dollars ($250) as a sanction.[15]

## V

## DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, FOR A CONTINUANCE AND SANCTIONS

Also before me is defendants NVB and Shell's *ex parte* motions to dismiss plaintiff's motion for partial summary judgment and, in the alternative, for a continuance and sanctions. Mrs. Montgomery only moves for sanctions.

The defendants seek dismissal of plaintiff's motion for partial summary judgment based on defective notice. Plaintiff's motion for partial summary judgment circumvented the 28–day notice provided for under Local Rule 230(b) by plaintiff bringing its motion under Rule 230(e) as a countermotion. As such, the defendants move to dismiss plaintiff's motion for partial summary judgment and in the alternative for a continuance and sanctions.

---

**14.** This sanction is payable to the Treasury of the United States rather than to the Nonappropriated Fund of this court pursuant to Local Rule 110 because it is imposed for a violation of the federal rules rather than the local rules.

**15.** Counsel shall file an affidavit accompanying the payment of these sanctions which states that it is paid by counsel, out of personal or firm funds, and is not and will not be billed, directly or indirectly, to the client or in any way made the responsibility of the client as attorneys' fees or costs.

### A. Motion to Dismiss Plaintiff's Motion for Partial Summary Judgment

As discussed above, plaintiff's motion for partial summary judgment is denied on the merits, accordingly, the motion to dismiss is rendered moot.

### B. Sanctions

#### 1. Defendant NVB

██ Plaintiff's counter-motion for partial summary judgment was made in response to defendant NVB's motion for summary judgment and is proper under Local Rule 230(e). Although defendant NVB argues the papers were served on defendant at 4:00 PM, thus denying defendant the normal 28–day period to prepare the reply and opposition, plaintiff has properly brought the counter-motion against NVB. Moreover, since I continued the hearing in this case to allow defendant NVB the normal period to respond to the plaintiff's counter-motion, defendant NVB's requests for sanctions is DENIED.

#### 2. Defendants Shell and Della Mae Montgomery

██ Neither defendant Shell nor Della Mae Montgomery originally filed a motion for summary judgment in this case. Thus, plaintiff's motion for partial summary judgment was not a "counter-motion" to a motion and does not fall within Local Rule 230(e). Moreover, plaintiff's motion for partial summary judgment was defective since it failed to give Shell and Mrs. Montgomery 28 days' notice in violation of the Local Rules and my order.

Plaintiff argues that its motion was consistent with Local Rule 230(e), which provides for counter-motions or any "other motion that a party may desire to make that is related to the general subject matter of the original motion." Local Rule 230(e). Although Rule 230(e) allows for motions related to the original motion, it does not provide that such motions may be directed to a party not already before the court by virtue of the original motion. Defendants Shell and Montgomery's motion for sanctions against plaintiff is granted. Each counsel shall file with the court an affidavit setting forth their actual charges to the client occasioned by their obligation to respond to the motion. If it is unable to separately segregate its charges relative to that opposition it may file an affidavit setting forth its good faith estimate. Counsel for plaintiff shall within ten days pay the amounts specified in the affidavits or shall request the court to consider the reasonableness thereof. If such a request is made, the court shall consider the matters in chambers and without oral argument.[16]

For all of the above reasons, IT IS HEREBY ORDERED as follows:

1. All motions for summary judgment are DENIED;

2. Defendant NVB's motion to strike plaintiff's jury demand is GRANTED;

3. Plaintiff's motion to withdraw admissions is GRANTED and sanctions are imposed in accordance with the above memorandum opinion;

4. Defendant NVB's motion for sanctions relative to plaintiff's filing of a motion for summary judgment is DENIED;

5. Defendants Shell and Montgomery's motions for sanctions are GRANTED in accordance with the above memorandum opinion; and

6. All other motions are found to be moot or deferred to pretrial in accordance with the above memorandum opinion;

7. A status conference is SET for June 24, 1991, at 2:30 p.m. The parties shall file status reports not later than seven (7) days prior to the status conference.

IT IS SO ORDERED.

---

16. Counsel shall file an affidavit accompanying the payment of these sanctions which states that it is paid by counsel, out of personal or firm funds, and is not and will not be billed, directly or indirectly, to the client or in any way made the responsibility of the client as attorneys' fees or costs.