G.J. LEASING CO., INC., Slay Transporta-
tion Co., Inc., S.I. Warehousing Co., Inc.,
d/b/a Bi–State Warehousing, and S.I.
Enterprises, L.P., Plaintiff,

v.

UNION ELECTRIC CO., Defendants.

Civ. No. 91–158–JPG.

United States District Court,
S.D. Illinois,
Benton Division.

July 9, 1993.

Joseph G. Nassif, Ronald L. Hack, Coburn & Croft, St. Louis, MO, for plaintiff.

Paul Venker, Edwin Noel, Susan Knowles, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, for defendants.

### MEMORANDUM AND ORDER

GILBERT, District Judge:

Pending before this Court are three motions for partial summary judgment. The first was filed by the defendant (Document No. 69), the second was filed by the plaintiffs (Document No. 74) and the third was filed by the defendant (Document No. 97).

### BACKGROUND

This is a five count civil suit concerning environmental issues at a certain site located at #2 Monsanto Avenue, Sauget, Illinois ("the Sauget site"). In Count I the plaintiff seeks damages for violations of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. The relief sought by the plaintiffs include damages amounting to the plaintiffs' response costs incurred as a result of the release or threatened release of hazardous substances at the site, plus interest, as well as attorney's fees and costs; and a declaratory judgment in the plaintiffs favor and against Union Electric ("U.E.") holding that U.E. is liable for all response costs to be incurred by the plaintiffs in the future. Count II is a common law negligence claim premised on U.E.'s duty to the general public and to future owners of the Sauget site to exercise reasonable care in disposing of the hazardous substances on the Sauget site and/or to disclose the unreasonable risk created by the disposal to subsequent vendees. Count III is a willful and wanton conduct claim premised on the same conduct as Count II. Count IV is an ultrahazardous

**1366**

activity claim which alleges that U.E.'s disposal of hazardous substances at the Sauget site was an abnormally dangerous and ultra-hazardous activity. And finally, Count V is brought pursuant to the Resource, Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903, et seq. This Count requests the Court to enjoin U.E. from further violations of RCRA; enter judgment in the plaintiffs favor and order U.S. to notify the proper Illinois state agency of the existence of the underground storage tanks at the Sauget site and to properly close the tanks; and to order U.E. to pay the plaintiffs' costs of this litigation. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 113 of CERCLA, 42 U.S.C. § 9613(b), 28 U.S.C. § 1367(a), and 42 U.S.C. § 6972(a)(1)(A).

### FACTS

Union Electric ("U.E.") generated electricity at its Cahokia Power Plant ("the Site") for over fifty years at Sauget, Illinois. The Sauget site was decommissioned in 1976 due to economic factors. (U.E. Ex. 1, Statement of Uncontroverted Facts, ¶¶ 4, 5; U.E. Ex. 5, Phased Unmanning of Cahokia Power Plant Report; U.E. Ex. 6, Baker Depo. pg. 40; U.E. Ex. 7, Arras Depo. pg. 86–89). In 1978, U.E. issued bid invitations for the purchase of the Sauget site (U.E. Ex. 9, Union Electric Bid Invitation for Cahokia Power Plant Facility, pg. 1) and included a bid specification memorandum that stated all proposed work under any arrangement where U.E. was to retain ownership was to comply with OSHA and EPA rules and regulations (U.E. Ex. 10, Bid Specifications for Disposition of Cahokia Power Plant at C–3). Also, equipment that contained any material that was declared hazardous, i.e., PCBs, asbestos, etc. was to be disposed of by legally accepted means (U.E. Ex. 10, Bid Specifications for Disposition of Cahokia Power Plant at C–1). The bid specifications went on to clarify that all "improvements and equipment" were to be purchased "as is—where is"; that U.E. "does not warrant that the property is of merchantable quality nor that it can be used for any particular purpose;" that the purchaser "accepts the property in place and its present condition, and recognizing the hazards involved"; and that "no consideration will be

granted for any misunderstanding of the site conditions, material or equipment, construction and features of the structures" (U.E. Ex. 10, Bid Specifications for Disposition of Cahokia Power Plant at pg. 1, D–1, D–2).

Nineteen prospective bidders responded to U.E.'s solicitation and were allowed to inspect the Sauget Site. Out of twelve proposals to purchase the property and the nonexcluded equipment in its entirety, the ultimate purchaser with a bid of nearly $1,600,000.00 was, G & S Motor Equipment Company ("G & S"). Prior to bidding on the project G & S and its joint venturer Sarnelli Brothers ("Sarnelli") toured the Sauget site as well as did Eugene Slay, representing G.J. Leasing. In connection with the Slay's proposal, Slay had retained the services of William Uhrig of Remelt, Inc. of Englewood, Colorado, an experienced salvage contractor (U.E. Ex. 15, Eugene Slay Depo. 3/30/92, pg. 31, 32 & 58; U.E. Ex. 2, Eugene Slay Depo. 3/16/92, pg. 63). During Slay's personal tour of the facility he described its condition as being in excellent condition—a "nine" on a scale of one to ten (U.E. Ex. 15, Eugene Slay Depo. 3/30/92 pg. 25–29, 60, 62, 80–82).

Prior to the closing transaction with U.E., and after the G & S was awarded the winning bid, G & S received several proposals concerning the property including an offer from Eugene Slay ("Slay") who had unsuccessfully submitted a bid to U.E. (U.E. Ex. 14, Sarnelli Depo. pg. 11).

On December 21, 1978, U.E. entered into an executory contract with G & S for the sale of the Sauget Site pending Illinois Commerce Commission ("ICC") approval (U.E. Ex. 17, G & S—Union Electric Real Estate Sale Contract, pg. 11, ¶ 15). On May 29, 1979, after receiving ICC approval, the U.E. and G & S sale transaction was finalized (U.E. Ex. 17, G & S—Union Electric Real Estate Sale Contract; U.E. Ex. 18, Union Electric Quit Claim Deed to G & S Motor Equipment Company Bill of Sale; and U.E. Ex. 20, Assignment and Assumption).

On March 29, 1979, prior to the consummation of the U.E. and G & S transaction, Slay entered into a Letter of Intent with G & S and Sarnelli for the purchase of the Site

(U.E. Ex. 1, Statement of Uncontroverted Facts, ¶ 6; U.E. Ex. 21, Letter of Intent). It was later formalized into a real estate contract dated April 23, 1979, (U.E. Ex. 22, Slay Warehousing Company and G & S Motor Equipment Company Real Estate Contract) that was ·contingent upon the U.E./G & S sale transaction.

Immediately following closing, G & S sold the property and equipment to Slay by quitclaim deed and the personal property and fixtures were sold "as is", expressly excluding warranties of "merchantable quality" or for "particular purpose" (U.E. Ex. 24, Bill of Sale Between G & S Motor Equipment Company and Eugene P. Slay and Joan Slay, pg. 2–3).

Following the conveyance, Sarnelli entered into a lease agreement with Slay to maintain salvage operations on the Sauget Site. Pursuant to that lease agreement, Sarnelli was to remove the smokestacks and level the floors in the power house building, remove all debris and all of its materials and equipment (U.E. Ex. 25, Lease and Easement Agreement, ¶ 4). If Sarnelli failed to remove any covered property, Slay reserved the right to remove the property at Sarnelli's expense (U.E. Ex. 25, Lease and Easement Agreement, ¶ 1(b)).

Prior to starting salvaging operations, Sarnelli informed Slay's Chief Operating Officer and in-house lawyer, Ted Tahan, that he would be removing asbestos at the Sauget site and thereafter advised EPA and his bonding company (U.E. Ex. 14, Sarnelli Depo. pg. 24–25). Thereafter, on July 2, 1979, Sarnelli advised EPA that he was removing asbestos from the site and simultaneously informed his bonding company and Slay (U.E. Ex. 14, Sarnelli Depo. pg. 24; U.E. Ex. 27, Letter from Sarnelli Brothers, Inc. to EPA). Mr. Slay admitted receiving the letter and stated that he probably would have sent it to Ted Tahan (U.E. Ex. 15, Eugene Slay Depo. 3/30/92, pg. 88–89).

In 1985, nearly eight years after they purchased the property, the Slay's began rehabilitating the building to convert it into a warehouse for general storage (U.E. Ex. 28, Schwartz Depo. pg. 16–17; U.E. Ex. 26, Lueken Depo. pg. 14–20). In doing so, Slay's

removed the remnants of Sarnelli's salvaging. The remnants contained scrap metal, insulation, piping and equipment that was· abandoned by Sarnelli, however, no attempt was made to test the insulation for asbestos containing materials prior to taking action (U.E. Ex. 26, Lueken Depo. pg. 34). Slay contends that he had no knowledge of the extensive amounts of hazardous materials on the Sauget Site and thus, was out additional amounts of money to remove ·it in response.

## STANDARD OF REVIEW FOR MOTIONS FOR SUMMARY JUDGMENT

 A Court may grant summary judgment only if the party seeking summary judgment demonstrates that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 841 F.2d 1347, 1354 (7th Cir.1988). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Crop. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988). Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered even if the opposing party fails to respond to the· motion. *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1222 (7th Cir.1984).

 When the parties do not dispute the factual basis of a motion for summary judgment, the court's only inquiry is whether judgment should issue as a matter of law. The burden of proof on this matter rests with the moving party. Summary judgment is inappropriate, however, if the parties disagree about inferences reasonably to be drawn from undisputed facts. *Bowyer v. United States Dep't of Air Force,* 804 F.2d 428, 430 (7th Cir.1986).

 When the parties dispute the facts, the parties must produce proper documentary evidence to support their contentions.

The parties cannot rest on mere allegations in the pleadings, *Boruski v. United States,* 803 F.2d 1421, 1428 (7th Cir.1986), or upon conclusory allegations in affidavits. *First Commodity Traders, Inc. v. Heinold Commodities,* 766 F.2d 1007, 1011 (7th Cir.1985). The Court must view the evidence and any permissible inferences from the materials before it finds in favor of the non-moving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). The non-moving party must show that the disputed fact is material; that is, it must be outcome-determinative under the applicable law. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986).

## DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT

U.E. has moved for partial summary judgment on the following grounds:

(1) Plaintiffs' common law counts are barred under the applicable statute of limitation because plaintiffs knew or should have known of the presence of asbestos and the condition of the property as early as 1978 and no later than 1985.

(2) Illinois law simply does not recognize plaintiffs' proposed theory of negligence liability for the sale of real estate.

(3) Plaintiffs have not established a claim based on ultrahazardous activity.

(4) Plaintiffs' claim for recovery of costs for asbestos abatement is jurisdictionally barred under CERCLA, because when U.E. sold the property to G & S Motor Equipment Company the asbestos was part of the structure of the building.

## 1. The Statute of Limitations

The first argument that this Court will exam is that Counts II, III, and IV are barred by the applicable statute of limitations. Defendant U.E. states that the motion for partial summary judgment should be granted because plaintiff's common law claims are barred by the statute of limitations. The defendant argues that under both Illinois law and CERCLA's federally imposed discovery rule for common law causes of action, plaintiffs should have brought their negligence and ultrahazardous claims against U.E. within five years from the date they knew or should have known of the allegedly defective condition of their property.

In Illinois, actions to recover damage to property, real or personal, must commence within five years after the cause of action accrues. Ill.Rev.Stat., ch. 110, ¶ 13–205. In determining the commencement date of the cause of action, Illinois law adopts a discovery rule *Jackson Jordan v. Leydig, Voit, & Meyer,* 199 Ill.App.3d 728, 145 Ill. Dec. 755, 759, 557 N.E.2d 525, 529 *on appeal,* 133 Ill.2d 558, 149 Ill.Dec. 322, 561 N.E.2d 692 (1990), citing *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981), *Nolan v. Johns–Manville Asbestos,* 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981), *Witherell v. Weimer,* 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869 (1981), *McLane v. Russel,* 159 Ill.App.3d 429, 111 Ill.Dec. 250, 253, 512 N.E.2d 366, 369 (1987), *Lincoln–Way Community College v. Village of Frankfort,* 51 Ill.App.3d 602, 9 Ill.Dec. 884–890, 367 N.E.2d 318, 324 (1977) which holds "that a cause of action accrues the date upon which plaintiff knew or should have known of the allegedly defective condition of the property". Further, in *Witherell,* the court stated that, "where only a single conclusion can be drawn from undisputed facts, it is for the court to decide when the plaintiff knew or reasonably should have known about his injury."

Plaintiffs respond to defendant's construction of the claims being time barred by arguing that the Illinois statute of limitations may be preempted by CERCLA Section 309(a)(1), 42 U.S.C. § 9658(a)(1) which provides:

In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, pollutant or contaminant released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period

shall commence at the federally required commencement date in lieu of the date specified in such State statute. *See Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1436 (7th Cir.1988); *Soo Line R. Co. v. B.J. Carney & Co.,* 797 F.Supp. 1472, 1487 (D.Minn.1972); *Merry v. Westinghouse Electric Corp.,* 684 F.Supp. 852, 854–55 (M.D.Pa.1988). The federally required commencement date is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4).

Plaintiffs argue that the statute effectively creates a federally mandated discovery rule for the accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury or property damage. *Soo Line R. Co.,* 797 F.Supp. at 1487; *see also Bolin v. Cessna Aircraft Co.,* 759 F.Supp. 692, 704, (D.Kan.1991). Plaintiffs further the premise, that under the statute, any state statute of limitations for an action seeking compensation for property damage caused by exposure to a hazardous substance will not commence running until any consequent injury is discovered, regardless of preexisting state law. *Bolin* at 704; *Electric Powerboard of Chattanooga v. Monsanto Co.,* 879 F.2d 1368, 1371 (6th Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990).

Plaintiffs add that other courts have held that the CERCLA statute of limitation begins to run when the plaintiffs knew or reasonably should have known that their property was contaminated *and* that the contamination resulted from defendant's conduct. *See Merry,* 684 F.Supp. at 855 (emphasis added); *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 730, 430 N.E.2d 976, 981 (1981); *Nolan v. Johns–Manville Asbestos,* 85 Ill.2d 161, 52 Ill.Dec. 1, 5, 421 N.E.2d 864, 868 (1981); *Witherell v. Weimer,* 85 Ill.2d 146, 52 Ill.Dec. 6, 11, 421 N.E.2d 869, 874 (1981). "The question of when a party knew or should have known both of an injury and

its probable wrongful cause is one of fact, unless the facts are disputed and only one conclusion may be drawn from them." *Nolan,* 52 Ill.Dec. at 5, 421 N.E.2d at 868. In this action, the plaintiffs argue that U.E. is unable to establish that the plaintiffs knew of the contamination at the Cahokia site and that it was the result of U.E.'s wrongful conduct at any time sooner than that alleged in the Plaintiff's Complaint, July 11, 1988.[1]

This Court finds that the Illinois statute of limitations and the CERCLA statute of limitations require the same amount of knowledge under the discovery rule. Under both statutes, in order to successfully argue that a cause of action is barred by the statute of limitations, the defendant must prove 1) that the plaintiff knew or should have known of an injury to their property (and in cases such as this it is added "that was caused or contributed to by the hazardous substance or pollutant or contaminant concerned) and 2) that the contamination resulted from another's conduct. *See, Witherell v. Weimer,* 52 Ill.Dec. at 11, 421 N.E.2d at 874 (concerning the discovery rule as it applies to Illinois statute of limitations); and *Merry v. Westinghouse Elect. Corp.,* 684 F.Supp. at 855 (concerning the discovery as it applies to the CERCLA statute of limitations). Accordingly, the Court must now examine the facts of this case and determine whether a genuine issue of material fact presents itself concerning the date upon which the plaintiffs obtained this knowledge or should have obtained this knowledge and therefore were under an obligation to inquire further to determine whether an actionable wrong was committed.

The defendant argues that the plaintiffs had notice of this possibility long before July of 1988 and the first instance of such notice was in the bid document. In the bid invitation, the specifications specifically advised all potential purchasers or salvagers of the possible presence of "material which has been declared hazardous" including "PCBs, asbestos, etc." at the site (U.E. Ex. 11, Bid Specifications for Disposition of Cahokia Power Plant at C–1). The defendant argues that

---

1. Slay alleges that he did not "learn of the significance of hazardous substances" until July 11, 1988, when his attorneys conducted an environmental audit of the Cahokia Facility.

this is sufficient notice that there may be PCB's and asbestos in the building. The plaintiffs' expert, David Schau, even testified that the specifications would "have given him notice that there may be PCBs and asbestos in the building." (U.E. Ex. 29, Schau Depo. pg. 133–136).

Also, as a part of the bidding process, all potential purchasers were required to tour the site. During this bidding process not only did the ultimate purchaser, G & S, tour the site, but Slay also toured the site. (U.E. Ex. 15, Eugene Slay Depo. 3/30/92, pg. 60). The defendant argues that the disclosures in the bid and the inspections were clearly sufficient notice to place a reasonable person on notice as to the building's condition. Sarnelli, the Slay's lessee for the purpose of salvaging, testified that from the information given, and his personal experience, he was well aware of the presence of asbestos and possible PCBs in the power plant building at the time of the purchase. (U.E. Ex. 14, Sarnelli Depo. pg. 25).

The defendant argues that the second instance of clear notice being given to the plaintiffs that asbestos was on this property was July 3, 1979. At that time Sarnelli notified the EPA and Eugene Slay that salvaging activities were being conducted at the site and that he was aware of special EPA and Illinois requirements regarding asbestos removal. (U.E. Ex. 27, Letter from Sarnelli Brothers, Inc. to EPA). Moreover, Slay acknowledged the receipt of this letter and stated that he probably would have sent it to Ted Tahan (U.E. Ex. 15, Eugene Slay Depo. 3/30/92, pg. 88–89).

Finally, U.E. contends that plaintiffs continued operations on the site for more than a decade after salvaging ceased and prior to

filing the lawsuit, imputes knowledge to the plaintiffs. The defendant cites the *Koenig* case for the proposition that Illinois law imputes to an owner knowledge of the hazardous condition of his property after an extended ownership. *Koenig v. National Supermarkets*, 231 Ill.App.3d 665, 173 Ill.Dec. 450, 454, 596 N.E.2d 1329, 1333 (1992).[2]

The plaintiffs' response to these allegations of notice received is that they do not dispute that some notice was given, but what they do dispute is the extent of the notice received. The plaintiffs argue that the notice given in the bid specifications was that there *may* be *equipment* at the power plant that *may* contain PCBs or asbestos. The plaintiff argues that this warning is not only limited, but it is deceptive, in light of the indepth knowledge U.E. had regarding the extensive quantity of hazardous material that was present on the site.

U.E. knew the powerhouse was loaded with asbestos not only contained in equipment, but also surrounding pipe running throughout the building and contained in transite insulating board (Dille Depo., pg. 46; Hoag Depo., Ex. 2). U.E. also knew that transformers, which were located in a remote area of the roof of the powerhouse, contained high levels of PCBs (Wagner Depo. pg. 9–10, 20–21; Wagner Depo. Ex. 1). Plus, U.E. told Sarnelli that none of the transformers at the site contained over 50 ppm PCBs (Sarnelli Depo., pg. 43).[3]

As for the argument that the Slays went on a walk-through of the plant and therefore inspected the plant visually, the plaintiffs state that there is clear testimony that neither Mr. Slay nor his attorney, Ted Tahan, had any experience in inspecting commercial

---

**2.** The facts of the *Koenig* case address this issue of knowledge based upon length of time a condition is present on a much different scale than what is presented in the case at bar. In *Koenig*, a shopper slipped and fell on a puddle of water. The Court there held, "In a situation such as the one presented here, the general rule is that liability will be imposed where a business invitee, such as plaintiff herein, is injured by slipping on a substance on the premises if (1) the substance was placed there by the negligence of the proprietor, or (2) the defendant knew of its presence, or (3) the substance was there a sufficient length of

time so that proprietor had constructive notice of it. (citation omitted)."

**3.** PCBs were used extensively prior to the 1970s as a fire retardant. PCBs are regulated by the Toxic Substance Control Act ("TSCA") and its regulations are found at 40 C.F.R. § 761. Under the regulations, transformers containing less than 50 parts per million ("ppm") PCBs in their insulating oil are not regulated. Transformers containing 50–500 ppm are regulated to some extent and transformers containing over 500 ppm are highly regulated.

real estate or in salvaging such property and could not, from a walk through of the property, visually identify hazardous materials or contamination. (3/30/92 Eugene Slay's Depo., pg. 13–14, 15–17, 23–29; Tahan Depo., pg. 27–29, 42–43, 56–58, 60–62). Also, in regards to the suggestion that Slay's people supervised Sarnelli's salvaging operation, and therefore this supervision provided notice, the plaintiffs point out that none of the testimony cited by U.E. supports the assertion that any of the plaintiffs' people supervised Sarnelli's work. Moreover, based on the rights Sarnelli retained in its lease, it would have been totally inappropriate for the plaintiffs to do so.

As for Sarnelli's notice by his letter to the EPA, the plaintiffs' argue that U.E. is trying to make this notice into a notice to the plaintiffs of the presence of all of the asbestos at the Site, when this notice only confirmed what U.E. had vaguely referred to in its Bid Specification, that is, of the possible existence of asbestos in some equipment. The plaintiffs state that Sarnelli's notice, at the most, put Plaintiffs on notice that asbestos on equipment to be salvaged was removed and disposed of off Site. It gives absolutely no notice that there was more asbestos at the Site than what was on the equipment removed by Sarnelli, let alone disclosed the existence of PCBs and other hazards at the Site.

As for U.E.'s accusation that the plaintiff did not test the insulation for asbestos prior to its cleanup of the Site, the plaintiffs argue that U.E. fails to explain why Plaintiffs should have conducted tests when they had no knowledge that asbestos remained after Sarnelli's work was complete.

[11] Based upon the foregoing, the Court finds that the question of when the plaintiff knew or should have known of the presence of the hazardous substances in this instance is one for the jury to decide. It is not clear to the Court that only one conclusion can be drawn from the facts. The specification in the bid referred to equipment only; the visual inspection, without the proper training, is not necessarily helpful and Sarnelli's notice could be understood by the plaintiff to mean that all asbestos he would come upon he would remove. The Court is unable to state with certainty what date the plaintiff should have been aware of the situation on the site so as to shift the burden to the plaintiff to begin to investigate and ask questions.

### 2. The Plaintiff's Theory of Negligence

The second argument made by the defendant is that Illinois law simply does not recognize plaintiffs' proposed theory of negligence liability for the sale of real estate. The defendant states that in the plaintiffs' complaint plaintiffs are asserting that by selling the property to a purchaser in the demolition/salvage industry (G & S), U.E. negligently disposed of hazardous substances and failed to disclose the purported risk created by such "disposal" to plaintiffs. The defendant argues that the plaintiffs couched this claim in terms of negligence because a breach of contract or warranty action for environmental conditions allegedly existing on the property is clearly not viable under the constraints of Illinois law because the plaintiffs lack privity with U.E.

The defendants state that the plaintiffs are, in effect, asking this Court to vitiate Illinois' personal injury requirement and expand the parameters of vendor negligence liability to include any commercial transaction involving hazardous substances irrespective of whether those substances pose a real threat to the health or safety of the vendee or third party. The defendants add that, although the plaintiffs may be able to point to other states' laws, they will not be able to find any Illinois authority for the proposition that a vendor is liable in negligence for diminution in value to the property. The reason is because such risks are allocated by the written contract with the exception of personal injury. The plaintiffs attempt to avoid this result by arguing that G & S or Sarnelli acted as U.E.'s agent.

The issue presented by the defendant, simply stated, is that the plaintiff cannot prove a cause of action in negligence, because in order to do so the plaintiff must prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from that

breach. *Dinges v. Gabardi*, 202 Ill.App.3d 732, 147 Ill.Dec. 873, 560 N.E.2d 21 (1990); *Durr v. Stille*, 139 Ill.App.3d 226, 93 Ill.Dec. 715, 487 N.E.2d 382 (1985). The first element to exam is whether or not a duty can be shown to be owed by the defendant to this plaintiff.

Whether or not a duty exists between two parties is a question of law. *Orrico v. Beverly Bank*, 109 Ill.App.3d 102, 64 Ill.Dec. 701, 440 N.E.2d 253 (1982). In this case, the plaintiff alleges negligence on the part of the defendant in two ways: first, by negligently disposing of hazardous substances by selling the property to a demolition/salvager; and second, by negligently failing to disclose the unreasonable risk created by the disposal to subsequent vendees. Third Amend Complaint, ¶ 80. Therefore, as to each of these allegations of negligence there must be a duty, by the defendant to the plaintiff, to not be negligent in their actions.

As to the alleged negligent disposal of the hazardous substances, the Court finds that the plaintiff has not proven that a duty exists under common law to not dispose of these hazardous substances in the manner chosen by the defendant. It is true that there may be a duty based upon a federal statute or federal regulation, such as CERCLA, however, such duty would be filed under a separate cause of action.

The plaintiff argues that the law set forth in *Orrico v. Beverly Bank*, 109 Ill.App.3d 102, 64 Ill.Dec. 701, 440 N.E.2d 253 (1982) should apply to this situation. In that case the Court held,

We do not believe that this case falls into the category of a landowner's duty to warn of or make safe dangerous conditions on his premises; rather, the case is governed by the more general principle that a defendant owes a duty not to increase foreseeable risk of harm to another. (citation omitted) *But this duty to act with reasonable care does not, as plaintiff suggests, extend to the world at large.* Rather it is defined and limited by various considerations such as the relation between the parties, the gravity and foreseeability of the harm, the utility of the challenged conduct and the burden of guarding against it.

*Id.* 64 Ill.Dec. at 704, 440 N.E.2d at 256 (emphasis added). In opposition to this argument the defendant argues that the type of relationship that the Court was contemplating between the parties in this case is simply not present in the case at bar. The *Orrico* case did not concern a vendor/vendee or a vendor and a subsequent purchaser, but rather concerned a mentally impaired depositor and a bank ordered by the Court to conduct all of her affairs. The Court sees this as an important distinction. The bank and the mentally impaired woman had a definable relationship to which an end could be seen. In the instant case, however, making the defendant liable to the plaintiff would be stating that a vendor of property can be liable to any subsequent purchaser for a negligent act at the time of the original purchase. The Court understands that hazardous substances can cause very grave injuries, however, the Court is not inclined to extend liability for a negligent act of disposal indefinitely, especially when there are other causes of action that this plaintiff may file in order to be made whole.

Accordingly, the Court finds that the defendant is correct in asserting that this defendant has no duty to the plaintiff as to the disposal of hazardous substances.

As to the claim of negligence by failing to disclose the unreasonable risk created by the disposal to subsequent vendees, the defendant argues that based upon Illinois case law, a vendor cannot be sued for negligence, citing *Sparling v. Peabody Coal Company*, 16 Ill.App.3d 301, 306 N.E.2d 79 (1974). However, this case goes on to state that the duty is not an ordinary negligence duty, but rather derives from a condition upon the land, whether natural or artificial, which involves unreasonable risks to persons on the land, known to the vendor. This language takes a case of ordinary negligence against a vendor and creates a case which implicates the law set forth in the Restatement (Second) of Torts, § 353.

Section 353 discusses the duty of a vendor to the vendee "and others upon the land with the consent of the vendee" concerning undisclosed dangerous conditions known to the

vendor. The notes to this section define "others upon the land with the consent of the vendee" as "not only those who are there by the consent of the vendee as his licensees but any person to whom he subsequently sells or leases the land." Therefore, this section applies to the plaintiff in this action. Based upon this finding, the Court finds that the plaintiff may be able to prove that a duty was present and therefore a genuine issue of material fact presents itself.

■■ However, the problem that the Court sees with the negligence claim concerning negligent failure to disclose, is that the plaintiff cannot prove damages which are recoverable in a negligence action. In a negligence action a plaintiff may seek personal and property damages, but not economic loss. *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). Economic loss includes damages for inadequate value, costs of replacement or repair of the defective part, as well as diminution in value. *Id.* In Count II of their complaint the plaintiffs state,

> 82. As a direct result of the negligence of U.E. Plaintiffs have suffered damages, including but not limited to diminution of property value and costs of investigation, testing, sampling, removal, oversight, and legal fees and cost, all in excess of $300,-000, and Plaintiffs may be required to incur additional costs in the future.

All of the damages listed fit the definition of economic loss. As for the argument that personal injury is involved, the plaintiff offers the Court a reason for why no such injury has been shown. In the plaintiff's response to defendant's motion for summary judgment, at footnote 11, the plaintiff states,

> U.E. emphasizes the fact that Plaintiffs have not alleged injury. But U.E. knew as early as 1972 that injuries involving hazardous substances have a long manifestation period. For example, U.E. knew in 1972 that asbestos injuries are not manifested for twenty to thirty years. Hoag Depo. Exh. 3.

The Court construes this as arguing that the personal injury alleged by the plaintiff is the potential of developing an illness due to exposure to asbestos. This is not an injury in fact and the plaintiff has cited no cases, nor is the Court aware of any cases, which state that the probability of contracting an illness in the future is a sufficient foundation for a negligence claim.

The plaintiff argues that because these plaintiffs do not have a contract with these defendants they cannot fall back on a breach of contract action to seek economic loss. Based upon this distinction, the plaintiff argues that this case should be distinguished from the cases that hold that economic loss is unavailable in a negligence action. However, in the instant case, the plaintiff does have a cause of action by which they can seek economic loss and that is under CERCLA.

Based on the finding that there is no genuine issue of material fact regarding the lack of a duty owed to this plaintiff by the defendant under the common law in the disposal of the hazardous waste and the plaintiff's inability to prove a person or property injury as a result of the defendant's alleged failure to disclose this disposal, the Court will grant the defendant's motion for summary judgment as to Count II of the Third Amended Complaint as well as Count III. Count III seeks damages for willful and wanton activity and since a claim of willful and wanton conduct is merely an aggravated form of negligence, *See Corgan v. Muehling*, 167 Ill. App.3d 1093, 118 Ill.Dec. 698, 700, 522 N.E.2d 153, 155 (1988), the defendant is entitled to summary judgment on this count also.

### 3. Ultrahazardous activities

■■ The third argument made by the defendant is that the plaintiff cannot establish a prima facie case of abnormally dangerous activity and therefore the defendant is entitled to summary judgment on Count IV. The determination of whether an activity is an abnormally dangerous activity is a question of law for the court. *Indiana Harbor Belt R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1176 (7th Cir.1990). The *Indiana Harbor* case also makes clear that the Seventh Circuit finds that there is substantial support that the Supreme Court of Illinois would treat as authoritative the provisions of the Restatement governing abnormally dan-

gerous activities. Therefore, this Court will begin this analysis by reviewing the six factors designed to guide courts in the determination of what is an ultrahazardous or abnormally dangerous activity:

(1) existence of a high degree of risk of some harm to the person, land or chattels of others;

(2) likelihood that the harm that results from it will be great;

(3) inability to eliminate the risk by the exercise of reasonable care;

(4) extent to which the activity is not a matter of common usage;

(5) inappropriateness of the activity to the place where it is carried out; and

(6) extent to which its value to the community is outweighed by its dangerous attributes.

**Restatement (Second) of Torts § 520.**

The central idea behind the defendant's argument is that "[u]nder no stretch of Illinois law can the sale of an industrial building containing asbestos materials commonplace at the time be construed as an abnormally dangerous or ultrahazardous activity." **Suggestions in Support of Defendant's Motion for Summary Judgment, pg. 29.** The main response the plaintiff has to this argument is that it is not the sale alone that was the abnormally dangerous activity but rather the sale for the purpose of *demolition* when it was full of useless equipment containing large amounts of hazardous substances.

The defendant discusses that historically, this theory of strict liability has been restricted to such activities as the use or storage of explosives and flammable materials. *See, Continental Building Corporation v. Union Oil Company,* 152 Ill.App.3d 513, 105 Ill.Dec. 502, 504, 504 N.E.2d 787, 789 (1987) (adopting § 520 of the Restatement (Second) of Torts). The defendant goes on to argue that the mere presence of hazardous materials does not constitute an abnormally dangerous activity for which strict liability should be imposed. *Arawana Mills Co. v. United Technologies Corp.,* 795 F.Supp. 1238 (D.Ct. 1992). Also, whether or not an activity should be deemed abnormally dangerous is not tested by the substance itself, but by the activity alleged to be abnormally dangerous. *Indiana Harbor,* at 1177.

It does not appear that the plaintiff is disputing that the activity is what the Court needs to focus upon, but rather the plaintiffs emphasis that the activity is not the sale alone, but rather the sale for the purpose of demolition. There are two arguments presented to the Court to show that the demolition of such a site is an ultrahazardous activity. The first is that the testimony of the plaintiffs' expert, David Schau, was that "selling a power plant for demolition is probably one of the most dangerous activities that [he could] think of." (Schau Depos., pg. 31) And second, although no Illinois courts have yet to address this issue, the plaintiffs cite to cases in other jurisdiction that the plaintiffs argue deal with the issue presented here. *See, Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J. 1989); *T & E Industries v. Safety Light Corp.,* 227 N.J.Super. 228, 546 A.2d 570 (1988) and *N.J. v. Ventron Corp.,* 94 N.J. 473, 493, 468 A.2d 150 (1983), *quoting* 3 Restatement, Torts (Second) § 520, comment h, at 39 (1976).

In reviewing the parties arguments, and by doing its own research, the Court has determined the relevant issues presented here. The first issue is whether the Illinois Supreme Court would impose strict liability as between successive landowners for the undertaking of an abnormally dangerous activity. Second, whether the injury claimed by the plaintiffs is an injury contemplated by Illinois courts which decided that demolition of buildings in a metropolitan area is inherently dangerous as a matter of law. If the Court finds that this injury is not one that was contemplated by the Illinois courts, then is this demolition an ultrahazardous activity under the Restatement, rather than as a matter of law. If there is a question of material fact at this stage, the inquiry should stop here. However, this Court will also examine whether this sale is a disposal of hazardous substances, and whether such a disposal would be an ultrahazardous activity under Illinois law.

The Courts have been unable to find, and the parties have not cited, any Illinois cases dealing with the issue of whether or not a successive landowner may sue a remote vendor for an ultrahazardous activity the vendor performed on the land. However, the plaintiffs have cited a New Jersey case that directly deals with this issue. *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784 (D.N.J.1989). This Court finds that based upon the reasoning set forth in the *Amland* case, the Illinois Supreme Court would impose liability on successive landowners in this situation.

The *Amland* Court, after reviewing two other New Jersey cases on point, concluded that there are no practical or legal distinctions between the rights of a successor in title to enjoy its land and the rights of a neighboring property owner. The Court went on to add that even the ability of successor in title to contractually fix its right in the course of its purchase of the property is simply not sufficient to overcome the imposition of strict liability resulting from an abnormally dangerous activity. This Court finds that the Illinois Supreme Court would agree with this reasoning and therefore this plaintiff is a proper plaintiff to ask this Court to impose strict liability on this defendant.

The next inquiry is whether this type of injury is the type contemplated by the Illinois courts that demolition of buildings in a metropolitan area is inherently dangerous as a matter of law. In *Clark v. City of Chicago*, 88 Ill.App.3d 760, 43 Ill.Dec. 892, 410 N.E.2d 1025 (1980), the Court held that under Illinois precedent the demolition of a five-story building within the city of Chicago was an inherently dangerous activity, as a matter of law. (*See, Sherman House Hotel Co. v. Gallagher*, 129 Ill.App. 557 (1st Dist.1906); *Van Auken v. Barr*, 270 Ill.App. 150 (2nd Dist.1933)). In the *Clark* case, the plaintiff was suing for injuries sustained when a crane fell on him during the demolition. In other cases, the injury has been from the use of explosives in the demolition and flying debris. *City of Joliet v. Harwood*, 86 Ill. 110 (1877).

In the instant case, the plaintiff is suing for the costs of cleanup of hazardous substances and the diminution of their property. This Court sees these damages as distinctly different from the damages sought in a "usual" demolition case. This Court does not believe that the Illinois Courts were contemplating hazardous substance cleanup as potential damages when the decision to view the demolition of a building in a metropolitan area as inherently dangerous as a matter of law. Instead, this Court believes the damages contemplated were along the order of cranes falling, debris flying, and buildings falling into other buildings. Therefore, this Court finds that the Illinois Supreme Court would not rule this demolition a dangerous activity as a matter of law. Based upon this finding, the Court now must review the Restatement factors to determine whether or not a question of material fact is in dispute. In their memorandum neither party directly addresses each of these six factors. The defendant argues since the plaintiffs have occupied this site for over a decade with the asbestos, PCBs and underground tanks and no serious incidents have occurred, there is evidence that this is not an abnormally dangerous activity. The defendants go on to state that there are no regulations mandating the removal of asbestos and that the mere presence of the asbestos in the building is not a hazard. The defendants add that the plaintiffs have been unable to prove any "high degree of risk" as air monitoring showed that the asbestos levels in the air were well within acceptable regulatory levels. (U.E. Ex. 40, Guy Slay Letter to IEPA, pg. 1). The defendant then argues that public policy is against this activity being construed as an ultrahazardous activity simply because there are so many buildings which have asbestos in them.

The plaintiff argues that their expert in the field clearly stated that the demolition of a power plant was one of the most dangerous activities that he could think of. Then the plaintiffs present their policy argument that U.E. should be made an example so that future utility companies will design alternative disposal methods when ceasing ownership and operation of an outdated power plant.

Since neither party addressed the facts required by the Restatement's factors, this Court is not in the position to determine whether or not this activity was an ultrahazardous activity. Therefore, the Court finds that a genuine issue of material facts does preclude summary judgment on this issue.

### 4. Recovery of asbestos abatement under CERCLA

The final issue raised in the defendant's first motion for summary judgment is that under CERCLA the plaintiff cannot recover the costs of asbestos abatement. U.E. states that the plaintiffs are simply ignoring the fundamental fact that asbestos abatement actions are jurisdictionally barred under CERCLA. "Courts have categorically held that asbestos contaminants resulting from products which are part of the structure of residential or commercial buildings are beyond the purview of CERCLA. *See, Anthony v. Arthur Belch,* 760 F.Supp. 832 (D.Cal. 1991) (Congress' intent to prohibit asbestos removal actions extends to asbestos dust emanating from fire damaged material which were part of a building's structure) *aff'd.*" **Suggestion in Support of the Motion for Summary Judgment, pg. 37.**

The plaintiffs, on the other hand, appear to be arguing that since this site was not just sold, but was sold for the purpose of demolition, the above rule does not apply. In *CP Holdings v. Goldberg–Zoino & Associates,* 769 F.Supp. 432 (D.N.H.1991) held that a party who sells a building for demolition does not fall under the traditional rule of selling a property that has asbestos in the structure and later the vendee or subsequent purchaser must remove the asbestos due to their work on the site, such as renovation.

The plaintiffs cite *AM International v. International Forging Equipment Corp.,* 982 F.2d 989, 997, in which the Sixth Circuit reiterated that a disposal requires an affirmative act, and that a disposal does not occur where there has been "a conveyance of a

'useful, albeit dangerous product, to serve a particular, intended purpose.' *Prudential Ins. Co. v. United States . Gypsum,* 711 F.Supp. 1244, 1255 (D.N.J.1989)." *AM International,* at 997. This case does not directly deal with the issue of asbestos attached to a structure, but it does help the Court to define the full definition of a disposal.

The question that is now before the Court is whether this site was sold simply as a real estate transaction or for the purpose of demolition. In reviewing the relevant documents, it is clear by the Bid Specifications for Disposition of the Cahokia Plant (U.E. Ex. 10), that U.E. was seeking bids for demolition of the site.[4] However, in the original sales contract for the site executed by U.E. and G & S, the contract appears to be a normal commercial real estate contract. (U.E. Ex. 17). The determination of this issue appears to be the focal point of this issue. Based upon the evidence presented, the Court is inclined to find that U.E. sold this site for the purpose of demolition. Accordingly, the defendant has not met its burden of proof on this matter. Therefore, at the very least the Court finds that there is a genuine issue of material fact which precludes summary judgment on this issue.

In conclusion, the defendant's first motion for summary judgment (Document No. 69) is **DENIED IN PART AND GRANTED IN PART.** Summary judgment is granted to the defendant on Count II and Count III. Summary judgment is denied as to Count IV and as to the asbestos abatement portion of Count I.

### *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

In the plaintiffs' partial motion for summary judgment (Document No. 74), the plaintiffs request summary judgment on the issue of U.E.'s liability under 42 U.S.C. § 9607(a). The plaintiffs are not requesting this Court to decide the issues of: costs

---

4. Page C–2 of the bid specifications has a section entitled *DEMOLITION.* This section begins with, "In general, all structures, walls, foundations, anchor bolts, reinforcing steel, structural and misc. iron and steel, piping, conduit, cable,

etc. shall be removed below the adjacent yard grade.... All tunnels, basements, manholes, pits, voids, etc. below grade shall be filled with either rubble or other material resulting form the demolition...."

incurred to date responding to the release of hazardous substances, the appropriateness of the cleanup undertaken by the plaintiffs, or the extent of U.E.'s liability for these costs. The plaintiffs want these issues left for trial. The plaintiffs argue that there are no genuine issues of material fact regarding U.E.'s liability under CERCLA and therefore, they are entitled to judgment as a matter of law.

■■■ To establish U.E.'s liability under CERCLA, the plaintiffs must prove that there are no genuine issues of material fact for each part of the four part test. These four parts are:

(1) that the site in question is a "facility" as defined by § 9601(9);

(2) that the defendant is a "responsible person" under § 9607(a);

(3) that there was a release or threat of release of a hazardous substances; and

(4) that such release caused the plaintiff to incur response costs.

See *Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir.1992); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989); *U.S. v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373 (8th Cir. 1989). If the plaintiff establishes each of these elements, the defendant may try to establish one of the defenses listed in § 9607(b). These defenses include:

> To establish a defense to CERCLA liability a "person" must show by a preponderance of the evidence that the release or threat of release of a hazardous substance and the resulting damages were caused solely by—(1) an act of God; (2) an act of war; or (3) an act or omission of a third party other than an employee or agent of the defendant, other than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant....

*Environmental Transportation*, 969 F.2d at 507.

In the instant case, there is no dispute that the Sauget site was a facility.

To be a "responsible party" the defendant must be in of the following categories:

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. § 9607(a). Whether or not the defendant is a responsible party is a hotly contested issue in this case. The category that the plaintiff claims U.E. falls into is category three, "any person who by contract, agreement, or otherwise arranged for disposal..." *Id.*

In *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842, 845 (S.D.Ill.1984), the Court held that the language "or otherwise arranged for disposal" is very broad, and that the relevant inquiry is "who decided to place the waste into the hands of a particular facility that contains hazardous wastes." However, the Court added, "liability for releases under § 9607(a)(3) is not endless; it ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom." *Id.*

In the instant case, the plaintiffs' and defendant's arguments can be concisely stated. The plaintiffs believe that U.E. "arranged for the disposal" of the hazardous substances by the sale of the property to G & S. They argue that it was quite clear from the bids requested, from the fact that the facility was outdated and therefore obsolete, and from the full knowledge of U.E. as to the extent of

the hazardous substances that the sale of the property for demolition was an arrangement for disposal.

On the other hand, U.E. argues that the sale was simply a real estate transaction. The disposal occurred when the Slays leased the property to Sarnelli to be salvaged. U.E. argues that this was the time of the disposal, not the sale of the property. As for the PCBs, the defendant asserts that the plaintiff is arguing that the abandonment of use of the transformers in 1965 was the disposal. However, the Court understands this portion of the plaintiffs' argument as emphasizing that the equipment on the site was outdated and obsolete, not that the simple nonusage of the transformers was a disposal.

In part four of the defendant's motion for summary judgment, the Court has already made the determination that from the evidence before it there is still a genuine issue of material fact concerning whether this sale was simply a real estate transaction or a sale for the purpose of demolition. The Court now finds that the plaintiffs have not met their burden of proof regarding whether this sale was for the purpose of demolition, and therefore, a genuine issue of material fact precludes summary judgment on this issue.

Although the Court has made this determination, the Court will nevertheless analyze the remainder of the issues presented.

A release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment. . . ." 42 U.S.C. § 9601(22). However, to create liability under CERCLA there must be a release or a threat of release. The facts the plaintiffs assert to support the existence of a release are: when Sarnelli performed his work, releases occurred by allowing asbestos to drop to the floor as it was removed without proper enclosure procedures; asbestos was released during clean-up procedures; asbestos fell in grain stored in Cahokia Marine's powerhouse building; every time a person walks through the electric bay area, asbestos can be picked up on clothes and taken out of the building; and torn asbestos on the roof occasionally falls off

the outside of the building. As for the release of PCBs the plaintiffs argue that the mere existence of the abandoned transformers in a precarious location constitutes a threatened release. **Plaintiff's Memorandum of Motion for Summary Judgment, pg. 23.**

The defendants argue that none of these facts constitute a release or a threat of release. The main thrust of the defendant's argument is that the plaintiffs' own conduct of not notifying any regulatory agency regarding the alleged threat of release, or not notifying their employees as to the alleged asbestos hazard, indicates there has been no release. The defendant also points to the Environmental Assessment conducted by plaintiffs' counsel and states that this undermines the credibility of the argument that a threat of release of asbestos has occurred. As for PCBs, the defendants argue that the presence of these transformers, without more, does not invoke CERCLA jurisdiction.

Courts have held that a broad reading should be given to the terms "release" and "threat of release." *See Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989). This Court agrees. Therefore, the Court finds that as to asbestos it does appear that at least a threat of a release exists at the site. The defendant's argument that the environmental tests show that there has not been a release of the substances sufficient so as to register on this test has no bearing on whether a "threat of a release" is present. Also, the defendant has cited no cases indicating that in order to show a threat of release, the plaintiffs must first follow all regulatory requirements. From the facts set forth by the plaintiffs, it appears clear that there is a "threat of release" of asbestos on this site.

As for PCBs, the defendants cite the case of *C. Greene Equipment Co. v. Electron Corporation,* 697 F.Supp. 983 (N.D.Ill.1988) to stand for the proposition that the sale of transformers containing PCBs, without more, does not invoke CERCLA's jurisdiction. However, that case does not discuss what constitutes a release for PCBs, but rather disposes of that case with the determination

that a disposal did not occur. The plaintiffs counter that the mere presence of PCB transformers in a building can be a threat of a release, citing *Amland*, *supra*. However, *Amland* states that the presence of the hazardous substances *plus* the unwillingness of a party to assert control over the substances, amounts to a threat of a release. Upon examination of the caselaw and evidence presented on this issue, the Court believes that there is a genuine issue of material fact as to whether or not a release or threat of release occurred concerning the PCBs and will leave this issue to be decided at trial.

The final element of a prima facie case under CERCLA is that the plaintiffs must have incurred response costs. U.E. argues that because the plaintiffs have not established that they have incurred response costs consistent with the National Contingency Plan ("NCP"), they have not established the elements of a prima facie case under CERCLA. The defendant then cites a string of cases which hold that the incurrence of response costs consistent with the NCP is a fundamental element of a private CERCLA plaintiff's prima facie case. The plaintiffs' response to this argument is that in the Seventh Circuit, the incurrence of response costs consistent with the NCP is not required.

The Court finds that there is a split of authority on this issue. The split involves when proof of costs and consistency with the NCP becomes a factor. The defendant is correct in asserting that there are a number of jurisdictions that agree that NCP costs are an element of a prima facie case under CERCLA. "For the reasons that follow, I hold consistency with the NCP is an element of Artesian's prima facie case under section 107 and that Artesian's response actions should be evaluated under the current NCP." *Artesian Water Co. v. Gov. of New Castle County*, 659 F.Supp. 1269 (D.Del.1987). *See* Def. Response at pg. 4–5 for string cites.

The plaintiff is also correct in that in the Seventh Circuit, consistency with the NCP

appears to not be a factor in making a prima facie case under CERCLA. *Environmental Transportation. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir.1992). In listing the elements of a prima facie case, the Seventh Circuit cited the case of *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir. 1989). In *Amoco* the Court stated that the fourth requirement under CERCLA was "that the release or threatened release has caused the plaintiff to incur response costs." *Id.* at 668. Moreover, the Court states:

> If the plaintiff establishes each of these elements . . . the plaintiff is entitled to summary judgment on the liability issue. (citation omitted) This is true even when "there is a genuine issue as to appropriate damages." (citation omitted).

> A plaintiff may recover those response costs that are necessary and consistent with the National Contingency Plan ("NCP") § 9607(a)(4)(B); *see* 40 C.F.R. Part 300 (1988). Thus, once liability is established, the court must determine the appropriate remedy and which costs are recoverable.

*Id.* This Court interprets the Fifth Circuit to say that a prima facie case may be made without proof that the plaintiffs response costs are consistent with the NCP. However, in order to recover damages, the plaintiff must prove consistency with the NCP.[5] The Court finds that because the Seventh Circuit cited the *Amoco* case with approval in *Environmental Transportation*, that the Seventh Circuit must agree with this reasoning.

Therefore, the plaintiff need not prove that their response costs were consistent with the NCP in order to make a prima facie case. However, the plaintiffs must make this connection at trial before damages may be recovered.

In U.E.'s memorandum in response to the plaintiffs' motion, U.E. raises an affirmative defense. U.E. asserts that a third party was the sole cause of the release or threatened

---

5. Also, in *Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377, 1389–1390 (E.D.Cal.1991), the Court held, "In this circuit, however, it has been specifically held that a failure to comply with the NCP is not a defense to liability, but goes only to the issue of damages... Since under *Cadillac Fairview*, consistency with the NCP is not an element of liability, inconsistency is not a basis for granting summary judgment on the liability question."

release of the hazardous substance. The defendant argues that it is uncontroverted that it was Sarnelli's "housekeeping" to have plead the defense, but when it comes as no surprise to the plaintiffs, a technical error will not be fatal.

In the instant case, the defendant's argument from the beginning has been that the release was Sarnelli's fault and not U.E.'s. This defense comes as no surprise to the plaintiffs, and therefore, the Court will allow it to stand. The defendant is put on notice that this is the exception to the rule in this Court and faulty pleading will not always be tolerated.

Based upon the foregoing analysis the Court hereby DENIES the plaintiffs' motion for summary judgment (Document No. 74).

## DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

In defendant's second motion for partial summary judgment, dismissal or abstention (Document No. 97), the defendant moves this Court to grant summary judgment in its favor as to Count V of plaintiffs' Third Amended Complaint, or, in the alternative, to dismiss or abstain from exercising jurisdiction over Count V. The issues presented by this motion are:

(1) Which law is controlling concerning the underground storage tanks ("USTs"), the federal Resource, Conservation, and Recovery Act ("RCRA"), or the Illinois Underground Storage Tank laws?

(2) Because the Office of the Illinois State Fire Marshal ("OSFM") has instituted enforcement proceedings against plaintiffs concerning the underground storage tanks, *must* this Court defer to that agency's jurisdiction?

(3) Because the OSFM has instituted formal proceedings against plaintiffs concerning the underground storage tanks, *should* the Court defer to that agency's jurisdiction? and

(4) Who is the "owner" of the USTs for the purposes of the controlling statute?

## BACKGROUND

On May 1, 1990, the plaintiffs first discovered three abandoned underground storage tanks at the Sauget site. Two of those tanks were empty and one contained about six inches of material in the bottom (Johnson Depo. Ex. No. 3). Test results from the tank containing the material proved inconclusive although some type of solvent was suspected (Johnson Depo., pg. 114–121). On December 28, 1992, the plaintiffs learned of two other USTs left on the site by U.E., which contained enough material to obtain a sample. This sample contained petroleum-based material. Once the plaintiffs realized that the tanks contained petroleum products and therefore were not covered by CERCLA, the plaintiffs began proceedings to institute suit under RCRA.

In 1984, Congress passed amendments to RCRA, part of which established a federal program for regulation of USTs. 52 Fed. Reg. 12853 (April 17, 1987). The federal Environmental Protection Agency ("EPA") enforces the RCRA UST law. 42 U.S.C. § 6991e. RCRA allows states to implement and enforce the federal UST law as long as the state's laws and regulations are no less stringent than the federal requirements and as long as the EPA has given approval for the program. 42 U.S.C. § 6991c. Illinois has such a state provision, 415 ILCS 5/22.12 (1993), however, Illinois' program has never received federal approval.

Currently, OSFM is pursuing a civil enforcement proceeding against one of the plaintiffs' entities, Cahokia Marine Service, for violations of the Gasoline Storage Act, Illinois' UST law. The plaintiffs have repeatedly attempted to persuade various regulatory agencies to pursue enforcement proceedings against Union Electric concerning the underground tanks. *See* Linda Tape Letter, dated Jan. 4, 1993, Ex. 2 of Document No. 100. However, the IEPA, EPA and OSFM have declined to pursue any enforcement actions against U.E.

### ISSUES

The defendants argue that the OSFM has exclusive jurisdiction over the regulation of USTs in Illinois and therefore,

this Court should defer to their authority. The defendant appears to argue that because Congress expressly delegated the administration of RCRA's UST program to the states, once a state establishes a UST program it automatically becomes the controlling law in that state. This is an incorrect assumption. In order for a state's UST program to have primary enforcement responsibility in that state, the program must be found to be no less stringent than the federal program and the program must gain federal approval. There is no evidence before the Court that Illinois' UST program has ever received federal approval (*See* Plaintiffs' response to Motion pg. 4), or that federal approval has ever been requested.

Accordingly, Illinois' UST program acts independently from federal law. Therefore, the question becomes, since the EPA has not given approval to Illinois' UST program, does the federal law and its regulations pre-empt the state law.

 The plaintiff cites the case of *Gade v. National Solid Wastes Management Assoc.*, —— U.S. ——, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) for the proposition that the federal law should pre-empt the state law. In that case the Supreme Court set forth the three possible types of pre-emption: (1) express preemption, (2) implied- field pre-emption and (3) implied- conflict pre-emption. The Court in *Gade* found that a "nonapproved state regulation of occupational safety and health issues for which a federal standard was in effect is impliedly pre-empted as in conflict with the full purposes and objectives of the OSH Act." *Id.* at ——, 112 S.Ct. at 2383. The plaintiff asserts that this same rationale should apply in the case at bar; since the state program is not federally approved, it is in conflict with the federal statute. This Court agrees. In *Gade,* the Court added, "The design of the statute persuades us that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that the only way a State may regulate an OSHA regulated occupational safety and health issue is pursuant to an approved state plan that displaces the federal standards." *Id.* This Court finds that the design of this statute

also implies that Congress intended owners of USTs to only be subjected to one set of regulations. This is evidenced by the requirement of federal approval. Accordingly, the Court finds that Illinois USTs program is pre-empted by federal law.

Based upon this determination, the Court also concludes that it is not required for this Court to defer to OSFM's jurisdiction. However, the next question becomes *should* the Court defer to OSFM's jurisdiction and stay the proceedings in this case until the plaintiffs have completed their appeal of the agency's decision.

 The defendants argue that the doctrine of primary jurisdiction should apply in this case. The doctrine of "primary jurisdiction" was designed to promote proper relationships between the courts and the administrative agencies charged with particular regulatory duties. *United States v. Western Pacific R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Courts defer to an agency's primary jurisdiction where there is a need for the agency's expertise and special knowledge in complex areas not within the conventional experience of judges. *Far East Conference v. United States*, 342 U.S. 570, 574-5, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). In the instant case, the agency that the defendant wishes this Court to defer to is OSFM, an agency that deals with Illinois law. This Court has already made the determination that for the purposes of this suit, federal UST law applies. Therefore, the agency's decision would be of little guidance in the ultimate resolution of this matter. Also, the defendant is not a party to the OSFM matter and therefore, the agency's decision would in no way direct this Court in the matter that is currently before it.

Accordingly, this Court DENIES the defendant's request for dismissal or for a stay pending the outcome of the OSFM proceedings.

Therefore, the sole remaining issue before the Court is, under the federal UST regulations, who was the "owner" of the USTs on November 8, 1984, when the federal regulations went into effect.

The term "owner" means—

(A) in the case of an underground storage tank in use before November 8, 1984, or brought into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances, and

(B) in the case of any underground storage tank in use before November 8, 1984, but no longer in use on November 8, 1984, any person who owned such tank immediately before the discontinuation of its use.

42 U.S.C. § 6991(3). The debate in this case concerns what Congress intended the words "in use" to mean in this context.

The defendant argues that the plaintiffs are the "owners" of this tank based upon a document from the EPA entitled, *Revisions and Additions to the Underground Storage Tank (UST) Notification Definitions.* This document states:

III. Under Subtitle I, *non-operational storage tank* is defined as any underground storage tank in which a regulated substance will not be deposited or from which a regulated substance will not be dispensed after November 8, 1984. We propose that these non-operational tanks be divided into 3 groups:

1. Abandoned tanks (some regulated substances left in UST)

2. Inactive tanks (regulated substances in UST could be used later)

3. Taken out of operation (closed according to acceptable industry practices *or* emptied and properly cleaned)

The statue further states that "a tank taken out of operation on or before January 1, 1974, shall not be required to notify ...". This refers to tanks defined by # 3 above only. Owners of abandoned and inactive non-operational tanks should notify. Note that "non-operational" is not equivalent to "taken out of operation."

Ex. 3, Document No. 100. Based upon the facts presented to this Court, the Court finds that the USTs in question are abandoned. U.E. left these tanks with regulated substances in them, and since U.E. did not inform the plaintiffs that the tanks were even on the property, it is virtually impossible to think that the substances could be used later.

However, the determination that these tanks were abandoned does not answer the question of who was the owner for notification purposes.

On the next page of the above cited document, the EPA provides a chart for the purpose of calculating when notification of the presence of an UST must occur. Looking at the chart, since the tanks in question here hold and did hold a regulated substance, were in the ground as of the date notification was due and were not "taken out of operation" notification is required. The chart continues:

II. If the tank is subject to the notification requirements (I above), who must notify? Did the tank hold regulated substances on November 8, 1984?

Yes-*current owner* (i.e., owner of tank on date notification is due) must notify.

No-*former owner* (I.E., owner of tank on date regulated substances removed from tank) must notify.

The defendant argues that from this chart it is clear that the plaintiffs are the party responsible for notification. The plaintiffs have owned this property since 1979 and therefore it is clear that they owned the property as of November 8, 1984.

The plaintiffs argue that the words "in use" clearly mean that the tanks have a purpose for their existence. The plaintiffs assert that the defendant wants this Court to ignore the clear meaning of the words and look at an EPA directive to determine the words meaning. The plaintiffs argue that "plain meaning of legislation should be conclusive except in those 'rare cases' [in which] the literal application will not produce a result demonstrably at odds with the intention of [the] drafters." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

The plaintiffs assert that placing the burden of U.E. best serves the purposes of the statute which is to regulate USTs in order to protect the environment. "To read the statute to make Plaintiffs the owner would disserve the purposes of the UST law. Current owners of property who have no knowledge of the existence of tanks, could go for years

with tanks under their property causing extensive environmental damage. Further, such owners would be potentially subject to huge penalties for a situation they were totally unaware of." **Plaintiffs' Response, pg. 6.**

The plaintiff cites 50 Fed.Reg. 46602 (November 8, 1985), where the EPA has stated its interpretation of the ownership definition in the preamble to the RCRA notification requirements:

> With regard to a tank no longer in use on November 8, 1984, for which notification must be provided by the owner who discontinued its use, EPA believes that such owner should notify if the owner knows or has reason to believe the tank was permanently taken out of use for storing regulated substances. Indications that a tank is permanently taken out of use are: (a) if it is filed with inert solid or otherwise rendered unusable, or (b) if there is reason to believe that it will not be used in the future (e.g., the owner abandoned the tank, intakes and vents are paved over, access piping is disconnected or removed, or the tank was sold to a person who had no use for the tank such as a residential real estate developer).

The plaintiff asserts that by this statement the EPA clearly rejected a presumption of ownership by the person in direct control of real estate properties and facilities.

■ Based upon the foregoing the Court finds that under the federal regulations, U.E. is the owner of these USTs. In the preamble to RCRA it appears clear that the EPA was trying to place the burden of notification on the proper party. The Court has determined that these tanks are abandoned and therefore there is reason to believe that these tanks will not be used in the future. The main argument in favor of U.E. being the responsible party is that the plaintiffs were not given any notification by the defendants that these tanks were on the property at the time of purchase. The plaintiffs did not know about the tanks and therefore, it is impossible for them to notify the EPA of their existence. The defendant wants this Court to interpret "in use" passively to mean that a tank merely holding a regulated substance is "in use." Using a tank as a holding facility may very well be fit the definition of "in use." However, this Court finds that part of the definition of "in use" is that whatever use is being made of the tanks must be a conscious use. Here the defendant wants this Court to impose upon the plaintiffs a definition of "in use" that would also encompass unconscious acts. This Court refuses to do so.

Accordingly, the Court **DENIES** the defendant's motion for summary judgment.

## CONCLUSION

To summarize, the Court **GRANTED IN PART AND DENIED IN PART** the defendant's first motion for partial summary judgment (Document No. 69). Summary judgment was granted in favor of the defendant and against the plaintiffs on the negligence and willful and wanton counts. The plaintiffs' motion for partial summary judgment (Document No. 74) is **DENIED.** And the defendant's second motion for partial summary judgment (Document No. 97) is **DENIED.**

**IT IS SO ORDERED.**